## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. RDB-25-10 |
| | * | |
| JOSE ADAN LOPEZ-GUEVARA, | * | |
| | * | |
| Defendant. | * | |

**...oooOooo...**

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE TESTIMONY OF PROPOSED EXPERTS AND REQUEST FOR *DAUBERT* HEARING

The United States of America hereby submits the following response in opposition to the defendant's motions to exclude the testimony of Computer Forensic Analyst Christopher Vogeler, Special Agent Gregory Squire, and Michelle Chudow, MD, FAAP and request for a *Daubert* hearing (ECF Nos. 82, 85, 88).

### FACTS OF THE CASE

The government provided notice to the defendant of its intention to elicit the potential expert testimony of Computer Forensic Analyst Vogeler, Special Agent Squire, and Dr. Chudow.

### ARGUMENT

**I.    Legal standard**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

*United States v. Wiggins*, 708 F. App'x 105, 109 (4th Cir. 2017); Fed. R. Evid. 702. The "touchstone of the rule is whether the testimony will assist the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011).

The trial court's task is to ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provided five non-exhaustive factors a court may weigh in making this assessment: (1) whether a theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique or theory has gained "general acceptance" in the relevant scientific or expert community. *Id*. at 592–94. "[I]t is well established that experts may base their opinions on experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). The Fourth Circuit further opined in *United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003) that *Daubert*'s five factors neither necessarily nor exclusively apply to every expert. *See id.* (summarizing *Kumho*, 526 U.S. 137 at 141–42).

"The inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 594-95). Courts "should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence" and that, "[a]s with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596); *see also* Fed. R. Evid. 702

Advisory Committee's note to 2000 Amendment ("[R]ejection of expert testimony is the exception rather than the rule."). As a rule, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility" of the witness' assessment, "not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (quoting *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)).

> **II.    Computer Forensic Analyst Christopher Vogeler applied the accepted methodology and standards of image comparison in comparing exemplar images depicting the defendant's hands with questioned images depicting an adult hand sexually abusing a child.**

Mr. Vogeler has been a computer forensic analyst since 2017 and specializes in victim identification in the Child Exploitation Investigations Unit of the Homeland Security Investigations Cyber Crimes Unit. *See* Exhibit 1 (Vogeler CV). In this capacity, Mr. Vogeler regularly compares body parts[1] depicted in images of children engaged in sexually explicit conduct, to include hand comparisons. He has been an Amped Forensic Image Video Enhancement (FIVE) Certified Analyst since September 2018. *See id.* The defendant makes the following main arguments in the motion to exclude Mr. Vogeler's expert testimony: (1) the techniques used by Mr. Vogeler are common and consist of what any law juror can do, and (2) the proposed expert testimony should be excluded pursuant to Federal Rule of Evidence 403. ECF No. 82 at 5, 13.

A. Forensic Comparison Expert Testimony Has Been Admissible for Years.

In *Crisp*, the Fourth Circuit addressed challenges to two types of expert testimony, both of which were forensic comparisons. The first, latent fingerprint examination, was challenged in *Crisp* despite years of acceptance in the courts and in the scientific community. *See Crisp*, 324 F.3d at 266 (noting that fingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911). *Crisp* was the Fourth Circuit's first opportunity

---

[1] Mr. Vogeler also compares other items and people in images as other image comparison experts do.

to address the admissibility of fingerprint analysis in the post-*Daubert* era. *See id.* In determining that fingerprint analysis would be admissible, the Court noted that other Circuits had already found such evidence admissible. *See id.* (citing the Eighth, Seventh, and Ninth Circuits as well as some other district courts).

As noted in the government's expert disclosure regarding Mr. Vogeler, the image comparison technique for latent fingerprint examination is an analogous technique to that which was employed here, as is toolmark analysis and handwriting analysis. *See* Exhibit 2 (Vogeler Expert Disclosure). Indeed, Mr. Vogeler's experience includes not only one-to-one image comparison for hands but also other body parts, items visible in images, and people depicted in images. In conducting all of these comparisons, Mr. Vogeler is using the ACE-V method to assess characteristics and distinguish characteristics in the questioned images.

In *Crisp*, the defendant argued that: (1) there is no assurance that no two persons share the same fingerprint; (2) that fingerprint examiners may not be able to make reliable identifications on the basis of small, distorted latent fingerprint fragments. *See Crisp*, 324 F.3d at 267. The appellant then pointed to the fact that the National Institute of Justice, an arm of the Department of Justice, issued a solicitation for fingerprint validation studies in March 2000 as a reason that the government was uncertain of fingerprint evidence's reliability. *See id.* The appellant then made similar arguments as the defendant in the instant case, including: (1) "because the basic premises behind fingerprint analysis have not been properly tested, there can be no established error rates"; and (2) "fingerprint examiners operate without uniform, objective standards," including that "there is no generally accepted standard regarding the number of points of identification necessary to make a positive identification." *Id.* at 268 (summarizing the appellant's arguments).

The Fourth Circuit declined to entertain the wholesale exclusion of a long-accepted form of expert evidence; instead, it noted that, after *Daubert*, courts were now open to "a broader range of opinion evidence than was previously admissible. Although *Daubert* attempted to ensure that courts screen out 'junk science,' it also enabled the courts to entertain new and less conventional forms of expertise.'" *Id.* Although it noted that "the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well." *Id.* Nor was the Fourth Circuit overly concerned about how "different agencies may require different degrees of correlation before permitting a positive identification" because "fingerprint analysts are held to a consistent 'points and characteristics' approach to identification." *Id.* at 269. Furthermore, over time, fingerprint analysts established uniform standards through professional training, peer review, presentation of conflicting evidence and double checking." *Id.*

The Fourth Circuit credited the appellant's contention that "further research, more searching scholarly review, and the development of even more consistent professional standards is desirable"; however, the Court found that that contention offered it no reason to reject a form of evidence that had withstood the test of time. *Id.*

The second type of expert testimony that *Crisp* considered was handwriting analysis. Again, as with fingerprint analysis, handwriting analysis is another forensic comparison technique analogous to the hand comparison at issue here. At trial, the handwriting expert testified regarding size and spacing of letters and words in an exemplar and a note authored by the suspect. *See id.* at 271. The expert drew the jury's attention to the unique shaping of the capital letter "L," the unique shape of a letter "u," and misspellings that were the same in the exemplar and the note. *See id.* The Fourth Circuit noted that, like fingerprint analysis, handwriting analysis had a long history

of admissibility and handwriting comparison analysis had "achieved widespread and lasting acceptance in the expert community." *Id.* Because of this acceptance in the expert community, the Court had an assurance of reliability under the *Daubert* standard, even without an error rate or numerical standards or studies. *See id.* at 270–71 (rejecting the appellant's arguments regarding the admissibility of the handwriting expert's opinion based on a lack of reliability).

In concluding that the handwriting analysis was properly admitted, the Fourth Circuit also explained that, like with fingerprint analysis, the handwriting analysis ultimately merely draws "the jury's attention to similarities between a known exemplar and a contested sample." *Id.* at 271. The handwriting expert pointed out certain unique characteristics shared by the two writings, but the jury was left to analyze the note and decide for itself whether it agreed with the expert's opinion. *See id.* (highlighting the limited role of a forensic comparison expert).

Finally, the Fourth Circuit concluded that, should a certain handwriting analysis be flawed or flimsy, a defense attorney would bring that fact to the jury's attention through cross-examination and/or an expert of their own. But the insights that reliable expert testimony would provide the jury and the courts would not be denied to them, absent an actual challenge to the reliability of the analysis. *See generally id.*

After the Fourth Circuit's opinion in *Crisp*, this Court opined in *United States v. Rose*, 672 F. Supp. 2d 723 (D. Md. 2009) that latent fingerprint definition using the ACE-V methodology is generally accepted in the relevant scientific community, had a very low incidence of erroneous misidentifications, and was sufficiently reliable to be admissible generally and specifically in that case. Judge Blake noted in that decision that individual examiners can and do make mistakes, but the ACE-V methodology is not discredited by such mistakes; rather, independent verification of an examiner's findings and a defendant's own expert's analysis can be used in each case to

determine whether a misidentification has been made. *See id.* at 726 (discussing error rates in individual examiner's determinations). In *Crisp* the Fourth Circuit similarly noted that in a different case the "possibility of error was mitigated . . . by having two experts independently review the evidence." *Crisp*, 324 F.3d at 268, n.4.

### B. Other Courts Have Found Hand Comparison Testimony Admissible.

Numerous other courts over the course of at least a decade have found hand comparisons admissible as a type of comparison analysis. In *United States v. Legs*, 2020 U.S. Dist. LEXIS 166645 (S.D. September 11, 2020), the Federal Bureau of Investigation (FBI) case agent took photographs of Red Legs' left hand because a portion of the fingers of the suspect's left hand were depicted in the child pornography in the case. *See id.* at *12-*13. After sending these photographs to an FBI forensic examiner with expertise in comparison analysis, including comparison of images of body parts such as fingers and hands with known images from suspects, the case agent was instructed to retake the photographs because they were unsatisfactory. *See id.* at *13. After the new photographs were taken and submitted to the FBI forensic examiner, the forensic examiner was able to identify seven unique characteristics of the left knuckle, including a mole, that were the same between the known photographs of Red Legs's left middle finger knuckle and the knuckle in one of the child pornography images at issue. *See id.* Further, the forensic examiner identified nine unique features between the left index finger in one of the child pornography images with the known left index finger of Red Legs. *See id.* At trial, defense counsel questioned the forensic examiner's methodology and presented their own expert in fingerprint analysis to rebut the testimony.[2] *See id.*

In *United States v. Ricker*, 983 F.3d 987, 991 (8th Cir. 2020), an FBI forensic examiner

---

[2] That defense counsel in that case chose to use a fingerprint analysis expert to rebut the testimony further supports the analogous nature of all forensic image comparisons.

testified that he had compared known images of Ricker's left hand to two images of a left hand from a video found on a seized device. He then pointed out the similarities between the images and stated that Ricker's left index finger appeared to be the left index finger depicted in the video. *See id.* The defendant had moved to exclude the forensic examiner's expert testimony by alleging that the government failed to provide adequate notice of the expert opinion and failed to timely provide the comparison charts and exemplar photos. *See id.* at 996. In *Ricker*, the government had not disclosed *anything* about the expert until approximately two weeks before the start of trial, yet the court determined that no continuance was needed. Further, because no deadline had been set for the disclosure of expert testimony, the defendant was on notice when photos of Ricker's hands were taken pursuant to a warrant and already knew of the child pornography videos used for the comparison because they had been provided in discovery. *Id.* at 997. The Eighth Circuit noted that, "[v]isual comparisons of two images of hands may be within the province of an expert" but was distinguishable from the "scientific and highly technical" nature of DNA evidence; thus, a defense attorney would be able to present testimony that the fingers in the video were different from Ricker's. *Id.*

In *United States v. Merrell*, 842 F.3d 577 (8th Cir. 2016), the appellant unsuccessfully argued that the district court had erred in admitting the expert testimony of an HSI Special Agent who testified that it was likely that the adult hands visible in the child pornography belonged to the appellant.[3]

In *United States v. Richards IV*, a case from the United States Air Force Court of Criminal Appeals, 2016 CCA Lexis 285, at *175 (A.F.C.C.A. May 2, 2016), the trial court

---

[3] Although not specified in the published opinion, Mr. Vogeler would be expected to affirm that this Special Agent was in fact someone in the HSI victim identification unit in which he works who used the same methodology he employed in the instant case.

heard testimony from an FBI forensic examiner who testified that his duties included comparison analysis, which included comparing items depicted in photographs with other items. The forensic examiner was permitted to testify that he had compared the child pornography image with a photograph of the appellant's hand and that, based on the similar features between the two hands—such as knuckle creases, hand creases, and blemishes—in his opinion, the hands depicted in the two photographs were the same. *See id.* at *176. Trial defense counsel thereafter effectively explored the limitations of the forensic examiner's training and experience. *See id.*

On appeal, Richards raised for the first time a direct challenge to the forensic examiner's testimony, claiming that the forensic examiner lacked qualifications to serve as an expert in comparison analysis and that his testimony was not reliable under *Daubert*. *See id.* The appellate court disagreed for the following reasons: (1) the forensic examiner had been employed as a photographic technologist for nine years, attended a two-year training program, engaged in professional development activities, engaged in extensive comparison analysis as part of his duties, and previously testified as an expert in comparison analysis four times; (2) his qualifications were sufficient that his opinion could be helpful to the factfinder; (3) the testimony was limited to the study of the photographs at issue and the issue of whether the male hand in the pictures was that of the appellant; and (4) the examiner's work is all peer reviewed. *See id.* at *179-*180. Finally, the court noted that the testimony "only involved pointing out matching characteristics of the two sets of photographs, and then offering his opinion that the two sets of photographs depicted the same hand. We see no reason why these techniques would present any concern under *Daubert*." *Id.* at *180.

The Air Force Court of Criminal Appeals then concluded that even presuming error,

9

there was no prejudice in admitting the expert testimony, noting a "layperson's examination of the two sets of photographs easily reveals similarities between the hands depicted in each set" and the forensic examiner's testimony "only identified specific features of the hand in the photographs and added his opinion that, based on these features, the hand in each set of photographs belonged to the same person."   *Id.* at \*180-\*181.   The forensic examiner's testimony was helpful but hardly necessary given the weight of evidence in the case. *See id.* at \*181.

C.  <u>The comparison language used in Mr. Vogeler's report is consistent with <u>*Daubert*</u> standards</u>.

Mr. Vogeler's report is consistent with the accepted standards in the field of comparison analysis.  In the report, Mr. Vogeler describes in detail the process of obtaining the exemplar images, making copies of those images for the purpose of conducting the comparison analysis, and using image processing techniques to enhance the quality of the images for that analysis. This process is identical to the process outlined in the Scientific Working Group on Digital Evidence's (SWGDE) Best Practices for Photographic Comparison for All Disciplines.  *See* Exhibit 3; Exhibit 4 (Vogeler Redacted Report).

After a comparison analysis is made, the person doing the comparison analysis will come to a conclusion using a five-point scale.  The scale is standardized across the discipline in the Standard Guide for Image Comparison Opinions prepared by the Facial Identification Subcommittee of the Organization of Scientific Area Committees (OSAC) for Forensic Science. *See* Exhibit 5.  The opinion categories are: (1) strong support for different source, (2) support for different source, (3) inconclusive, (4) support for common source, and (5) strong support for common source.  *See id.*  The language under "support for common source" states, "an opinion category that the observed similar characteristics outweigh the observed dissimilar

10

characteristics but are insufficient to reach strong support for common source.  The nature and level of the observed similarities and dissimilarities in image characteristics are more probable given the proposition that the images depict the same sources than given the proposition that the images depict the two different sources." *Id.* at 5.  Here, Mr. Vogeler concluded that there was "support that [the exemplar and questioned images] come from a common source and it is likely that they depict the same person." *See* Exhibits 2, 4.

There is adequate assurance here that Mr. Vogeler's conclusions are consistent with existing professional standards in the field.  Furthermore, because Mr. Vogeler used the ACE-V methodology common in other forensic comparisons, his work was subsequently independently verified by an independent reviewer possessing similar training.  This factor is one that many courts have weighed in favor of reliability as noted above.

### D. Mr. Vogeler's Testimony Would Be Helpful and Not Prejudicial.

The Court should recognize that testimony drawing the jury's attention to specific similarities between two images will be helpful to the jury without preventing the jury from viewing the images themselves. *See Richards*, 2016 CCA Lexis 285, at *180 (explaining the reasoning for allowing hand comparison testimony).  Although the defendant claims that "[j]urors, imbued with tens of thousands of years of human history observing hands, having observed their own hands throughout their entire lives, and having, undoubtedly observed their hands and those of others in photographs from their childhoods into adulthood, would be equally situated to Mr. Vogeler to determine whether the evidentiary images align," that claim is not only factually dubious, it is also contradicted by the numerous cases allowing this precise testimony.  ECF No. 82 at 14.  Mr. Vogeler's analysis of any questioned images in his years of experience in image comparison is much more in depth than the cursory glances the average

person gives another's hands, even their own.  The average person is not identifying specific characteristics such as deep or light creases, or studying and comparing hands on a near-daily basis for hours at a time.  Nor does any one juror a have perfect recall of every hand they have ever soon, or have of the knowledge of human experience from "tens of thousands of years" past.  Instead, Mr. Vogeler can draw the jury's attention to previously unseen characteristics of a hand so that they can see any minute similarities and differences and come to their own conclusion regarding Mr. Vogeler's opinions.

### III.    Dr. Michelle Chudow's Expertise Is Sufficient to Support Her Proposed Testimony Regarding the Identity of the Minors in the Child Pornography Images.

The defendant takes no issue with Dr. Chudow's expertise generally but rather contends that her medical expertise does not make her an "image identification" expert who can testify about how the identifying marks on the victims and on the defendant are the same marks present in the child pornography.  *See* ECF No. 88 at 3 (stating the general objection).  But Dr. Chudow has extensive training and experience in medical examinations and specifically in finding identifying marks on the human body.  Dr. Chudow has conducted hundreds of SAFE  exams (Sexual Abuse Forensic Exam), both acute (when the sexual abuse had just occurred) and non-acute (subsequent examinations).  In child sexual abuse cases, she has conducted non-acute examinations scores of times in two different child advocacy centers in Baltimore County (where she was the Medical Director for 5 years) and in Baltimore City.  In this case, Dr. Chudow performed the examinations of the minors "for non-acute sexual abuse evaluation/STI testing and documentation of identifiable skin findings." *See* Exhibit 6 (Dr. Chudow Report).  Dr. Chudow has performed dozens of the same type of examination that included documentation of skin findings for later identification.

In addition to her extensive experience examining minors who are victims of sexual abuse, Dr. Chudow has also examined child pornography images of pre- and post-pubertal determination

dozens of times and compared images of child pornography to patients of hers approximately 25 times.  In cases where Dr. Chudow made a positive identification, she has never subsequently learned of a misidentification.  Further, all of Dr. Chudow's opinions are peer reviewed.

Dr. Chudow has significant expertise specifically in identifying and distinguishing between marks on the body, such as moles, scars, injuries, etc.[4]  Since she began her residency in 2009, Dr. Chudow has worked extensively in the field of physical and sexual child abuse. Notably, during her five years as medical director of the Baltimore County Child Advocacy Center, she was frequently called on to make these identifications.  And not just as to patients that she examined in person.  Dr. Chudow has also viewed hundreds of pictures to determine skin findings, including but not limited to: moles and birthmarks, signs of physical injury, burns or abrasions, and determining the difference between injury and rashes and permanent marks.  Not only is all of this type of identification covered in medical school and subsequent training like residency and fellowship, it is also required to become a pediatrician and even more required for someone in the field of physical and child sexual abuse.

The defendant also contends that Dr. Chudow's opinions follow no scientific standard and lack a statistical analysis and would only be her subjective opinion. *See* ECF No. 88 at 3.  The defendant could claim the same about any kind of medical diagnosis or of the field of medicine entirely.  Yet physicians are frequently qualified as expert witnesses because, unlike, some expert witnesses, physicians are not testing a product for tensile strength or even using a mathematical model to predict the likelihood of economic impact.  The Ninth Circuit in *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) explained that medicine is a science but it not entirely scientific.

---

[4] Although not discussed in the defense motion, based on recent conversations with counsel, the defendant also objects to Dr. Chudow's testimony identifying various marks in the images, including freckles and scars.  The court should also allow this testimony as clearly within Dr. Chudow's expertise and training.

Instead, medicine is a "learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit . . . much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively." *Id.* Physicians therefore use their knowledge and experience as a basis for weighing known factors along with inevitable uncertainties to make a sound judgment. *See id.*

**IV.   Special Agent Greg Squire Should Be Permitted to Testify Regarding the Dark Web.**

The government disclosed in its first discovery production that this case began with images from the dark web and, after the defendant's motion to exclude Special Agent Squire's testimony, produced an expert disclosure out of an abundance of caution that detailed the specific topics covered by his mixed fact and potentially expert testimony. *See* Exhibit 7 (Squire disclosure). But the topics covered by the expert disclosure nevertheless can be addressed by a non-expert Special Agent whose duties encompass extensive work with the dark web. In addition, because the dark web necessarily involves the internet, Special Agent Squire also can give basic definitions of metadata and EXIF data and his limited encounters with both for this case.

Special Agent Squire's involvement in the case spanned approximately a couple hours at most, while he was attending a gathering of child exploitation investigators at a victim identification conference. Special Agent Squire was asked to review depictions of previously unidentified child pornography that other investigators at the conference had identified as likely being the same victim seen in Facebook accounts belonging to Maryland residents (based on the contents of the accounts). Special Agent Squire independently reviewed the images and agreed that the child in the dark web sex abuse materials was likely the same child in the Facebook accounts of Maryland residents. Special Agent Squire immediately forwarded the case to the Baltimore Field Office for investigation. This entire review took approximately one hour. After this initial forwarding,

14

Special Agent Squire located additional files on the dark web depicting the same victim and forwarded those files as well.

The defendant on the one hand says that there is deficient notice that "deprives [him] of a meaningful opportunity to challenge the proposed expert witness testimony" and on the other has filed a motion to exclude the testimony, naming specific topics that he is already aware would potentially be covered by Special Agent Squire's testimony. *See* ECF No. 85 at 4 (listing the following topics: law enforcement efforts and techniques to investigate crimes on the Darkweb, the identification of videos of child sexual abuse on the darknet, including digital, forensic data associated with those videos, and unique investigative techniques utilized in this case, including "searches in open source repository."). In any case, the government produced an expert disclosure in this case that covered a subset of the defendant's listed topics. Because there was no deadline and, up until less than a week before this disclosure, the parties believed a resolution short of trial was possible, the government's disclosure was on a reasonable timeline. Additionally, the subject of the testimony is uncomplicated was generally known to the defense since shortly after the initial indictment was returned. Special Agent Squire's testimony should not be excluded for timeliness issues if he is to be qualified as an expert.

V.      **The defense has not established a need for a *Daubert* hearing in this case.**

The Supreme Court's decision in *Daubert* requires that trial courts make a "preliminary assessment" of whether proffered expert testimony is both reliable ("based on scientific knowledge") and helpful ("of assistance to the trier of fact in understanding or determining a fact in issue"). *See Maryland Casualty Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir.1998). A court is not required to hold a hearing simply because a party has raised a *Daubert* issue. Whether to hold a separate *Daubert* hearing in advance of admitting expert testimony is

15

within the trial court's discretion.  *United States v. Ashburn*, 88 F.Supp.3d 239, 243 (E.D.N.Y. 2015).

In *United States v. Davis*, 602 F. Supp.2d 658 (D. Md. 2009), the defendant filed a motion to exclude DNA results and requested a *Daubert* hearing based on the type of DNA testing used and challenged whether all steps of the DNA typing methodology were correctly performed.  The court agreed with the government's position that these challenges went to the proficiency of the tester rather than the reliability of the test, going to the weight of the evidence, not reliability/admissibility.  *Id.* at 677.  The court concluded that no *Daubert* hearing was necessary, "[T]his circuit has taken the position that the *Daubert* court 'was not formulating a rigid test or checklist,' and was 'relying instead on the ability of federal judges to properly determine admissibility.'"  *Id.* at 663 (*quoting Therm–O–Disc*, 137 F.3d at 785 (internal citations omitted)).

The absence of a hearing does not relieve the government of its obligation under Rule 702.  Mr. Vogeler, Dr. Chudow, and potentially Special Agent Squire must still be qualified as experts, and they will no doubt be subject to the type of vigorous cross-examination that the *Daubert* court contemplated.  A court need not determine that the proffered expert testimony is irrefutable or certainly correct. *See United States v. Moreland*, 437 F.3d 424, 431 (4th Cir.2006).  Rather, the proper inquiry is whether the opinion is based on valid reasoning and reliable methodology.  *See TFWS v. Schaefer*, 325 F.3d 234, 240 (4th Cir.2003) ("In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself.").  Here the Court can find that the government's experts' proffered testimony is helpful and based on a reliable methodology.   As such, no *Daubert* hearing is necessary.

## **CONCLUSION**

For the above reasons, the Defendant's Motion to Exclude the Testimony of Computer Forensic Analyst Christopher Vogeler, Special Agent Gregory Squire, and Michelle Chudow, MD, FAAP and Request for *Daubert* hearing should be denied.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:　　　＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿
Victoria Liu
Paul Budlow
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 27, 2026, a copy of the foregoing opposition response was delivered via the CM/ECF system to counsel for the defendant, and all other registered CM/ECF users.


By: _____/s/_____
Victoria Liu
Assistant United States Attorney

18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. RDB-25-10** |
| | * | |
| **JOSE ADAN LOPEZ-GUEVARA,** | * | |
| | * | |
| **Defendant.** | * | |
| | ...oooOooo... | |

## <u>ORDER</u>

IT IS THIS _____ DAY OF _____, 2026, HEREBY ORDERED, for good cause shown, that the Defense Motion to Exclude the Expert Testimony of Computer Forensic Analyst Christopher Vogeler, Special Agent Gregory Squire, and Michelle Chudow, MD, FAAP and Request for Daubert Hearing (ECF Nos. 82, 85, 88) in the above-entitled case shall be DENIED.


_____
The Honorable Richard D. Bennett


_____
Date